_____ FILED          _____ ENTERED
_____ LOGGED _____ RECEIVED

**11:35 am, Jun 09 2020**
AT  BALTIMORE
CLERK, U.S. DISTRICRT COURT
DISTRICT OF MARYLAND
BY _____TTS_____Deputy

GDB/KOH: USAO 2017R00879

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CASE NO.** 20-1497-TJS |
| | * | |
| **GLENDA HODGES,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

**\* \* \* \* \* \* \***

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Amy McAleese, being first duly sworn, hereby depose and state as follows:

### Introduction

1.     I make this affidavit in support of a criminal complaint and arrest warrant. Based on the following facts, there is probable cause to believe that, in the District of Maryland and elsewhere, **GLENDA HODGES** ("**HODGES**") committed wire fraud and bank fraud, in violation of 18 U.S.C. §§ 1343, 1344, and 2.

### Agent Background

2.     I am a Special Agent with the United States Department of Justice ("DOJ") Office of the Inspector General. I have been in this position since October 2018. Previously, I was a Special Agent at the United States Postal Service Office of Inspector General since December 2012. I have received training in the investigation of financial crimes and have experience investigating the theft of government funds. As a federal agent, I am authorized to investigate violations of the laws of the United States, and as a law enforcement officer, I am authorized to execute warrants issued under the authority of the United States.

## Probable Cause
### Introduction

3.      **GLENDA HODGES** ("**HODGES**") was the owner of a nonprofit company in Clinton, Maryland called Still I Rise Incorporated ("Still I Rise"), and a for-profit weight loss clinic called the Women's Wellness Center ("WWC"), both of which have since closed. Between 2010 and 2017, **HODGES** was awarded over $2 million in grants from the United States Department of Justice's ("DOJ") Office of Violence Against Women ("OVW") and Prince George's County to implement a violence against women program through Still I Rise. However, as WWC—a financially unviable enterprise—continued to lose money, **HODGES** resorted to committing fraud to fund WWC.

4.      In June 2017, OVW referred **HODGES** and Still I Rise to the DOJ's Office of the Inspector General. Between 2010 and 2017, OVW awarded Still I Rise approximately $896,999 in OVW grants. Between 2012 and 2017, Prince George's County awarded **HODGES** an additional $1,179,000 in county grants.

5.      In 2014, **HODGES** organized Still I Rise Comprehensive Support Services & Training, LLC ("CSST"), a limited liability company that owned and operated WWC, which was located at 9023 Woodyard Road, Clinton, Maryland in an old bank building that **HODGES** purchased in April 2014 through CSST.

6.      As of March 4, 2017, WWC's website reflected that **HODGES** was the Chief Executive Officer of WWC. The "our services" tab of the website directed the visitor to only two additional pages—one enumerating the insurance plans WWC accepted, and one describing WWC's "Weight Loss Management" program.

2

7.      **HODGES** was the Chief Executive Officer of Still I Rise, CSST, and WWC (which did business as CSST).

### The Grants

8.      OVW administers grant programs related to domestic violence, sexual assault, and stalking. OVW awarded **HODGES** grants in 2010, 2012, and 2014.

9.      In September 2010, OVW awarded Still I Rise grant 2010-UW-AX-18 totaling $299,999 for a two-year period beginning on October 1, 2010. In September 2012, this initial grant was supplemented with an additional $297,000 and extended until September 30, 2014. In September 2014, OVW awarded Still I Rise grant 2014-KS-AX-4 totaling $300,000 for a three-year period beginning on October 1, 2014. In total, Still I Rise received $896,999 from OVW.

10.     DOJ records show that **HODGES** electronically filed the documents associated with the grant applications, and that **HODGES** was the sole authorized representative and financial point of contact for the OVW grants. In October 2010, **HODGES** completed an automated clearinghouse ("ACH") enrollment form that directed OVW to deposit the grant funds into a Bank of America account ending in 1268 ("BOA 1268")—a business checking account opened under the name of Still I Rise. **HODGES** was the sole signer on BOA 1268.[1]

11.     The applications **HODGES** sent to OVW stated that the grant money would be used to fund Still I Rise, which would provide "support and resources" to minority survivors of domestic violence, sexual assault, and stalking. For instance, the 2010 application states as follows:

---

[1] All bank accounts are identified by the financial institution and the last four digits of the account number.

> **SECTION B. WHAT WILL BE DONE**
>
> *Project Goals and Objectives.* Still I Rise, Inc. is a community based empowerment
> organization for women whose organizational goal is to provide an environment for healing and
> self-growth. The purpose of this 24-month grant is to:
>
> 1. Increase the Prince George's community capacity to provide culturally and linguistically
>    specific resources and support for victims of intimate partner crimes and their families;
> 2. Develop education and prevention strategies highlighting culturally and linguistically
>    specific issues and resources regarding victims of intimate partner violence crimes;
> 3. Provide culturally and linguistically specific resources and services that address the safety,
>    economic, housing and workplace needs of victims of intimate partner violence, and
> 4. Examine the dynamics of culture and its impact on victimization and healing.

12.     The application goes on to list specific services that Still I Rise would provide, including legal clinics, food cooperatives, shelter and transitional housing, and a residential life skills center. The organization's stated purpose remained substantially the same through the 2014 application process. For example, the abstract that accompanied the 2014 application provided as follows:

> Initial services provided by Still I Rise included outreach and awareness efforts through
> community education. Over time, the organization established a network of resources resulting
> in numerous client referrals. As a grantee carrying out the goals and objectives of DOJ OVW
> funding, Still I Rise is experiencing an increase in clients in need of sexual assault services and
> initiated direct services for sexual assault survivors in 2012. Services include crisis intervention,
> counseling services/support group; material assistance; financial counseling; employment
> counseling; job training; advocacy; court/medical accompaniment; language services; and
> transportation. Still I Rise had initially planned to serve 200 clients over two years but has
> actually served more than 800.

13.     OVW requires grant applicants to submit detailed budgets specifying how the recipient will spend the grant funds. When OVW awards the grant, the grantee's authorized representative (in this case **HODGES**) must sign a grant acceptance document stating that "grant funds may be used only for the purposes in the recipient's approved application" and that work or

4

activities not specified in the grant application that use staff, goods, or services that the grant pays for must receive "prior written approval from OVW."

14.    For example, the 2014 grant award to Still I Rise authorized Still I Rise to use the grant money to support five areas of operation over three years:

- $156,000 to pay both **HODGES**'s salary as Still I Rise's director ($12,000 per year) and Individual 1's salary as Still I Rise's manager ($40,000 per year).

- $10,002 to pay for travel to OVW-mandated training.

- $4,852 for printed materials, enumerated as "brochures, flyers, and event invitations," and postage.

- $82,346 for counseling services, outreach events, and legal aid clinics.

- $46,800 for costs associated with Still I Rise's increased leased space of 4,635 square feet with "dedicated space" for counseling activities and sexual assault staff.

15.    To that end, the three grants OVW awarded **HODGES** and Still I Rise were authorized only for the stated purpose of implementing Still I Rise's non-profit program to address violence against women, and the funds were only authorized to cover the costs detailed in the respective budgets that **HODGES** submitted with the grant applications.

### *Discovery of Grant Misappropriation*

16.    In early 2016, **HODGES** contacted OVW to express interest in applying for OVW's 2016 three-year grant and informed OVW that Still I Rise exhausted the 2014 grant (which also had a three-year duration) in only 16 months. OVW then conducted an initial review of Still

I Rise's bank records and invoices, and discovered that **HODGES** was using much of the grant money for personal expenditures and to unlawfully support WWC.[2]

17.      When OVW reviewed Still I Rise's business and bank records, it discovered incomplete invoices for staff salaries and counseling services at Still I Rise, unauthorized expenditures at Still I Rise, and unauthorized expenditures related to WWC. For example, the invoices OVW reviewed reflected the following:

- Payments totaling $233 to Nestle for water cooler services at WWC.[3]

- Payments totaling $2,577 to Nestle for "Optifast" products. Optifast is a weight loss product that Nestle sells and that is implemented in a clinical setting. The invoices related to Optifast were billed to "Still I Rise Inc., The Women's Wellness Center" and were shipped to WWC.

- Payments for utilities and facilities services at WWC, including seven months of Pepco payments for electrical service at WWC totaling $2,505, and nine months of Comcast payments for cable, internet, and phone services at WWC totaling $3,104.

- Payments of $180 to Stanley Access Tech LLC for services at WWC.

- Payment of $144 to ADT Security Services for work at WWC.

- Payment of $875 to Creative Solution Design for cleaning services at WWC.

- Payment of $3,000 to CL Group LLC for the appraisal of 9023 Woodyard Road (the WWC facility).

- Payments for business services and supplies at WWC, including seven months of payments totaling $3,728 to CINTAS for services at WWC.

---

[2] Upon learning that **HODGES** spent three years' worth of grant money in 16 months, OVW directed **HODGES** to submit a copy of Still I Rise's general ledger for review. **HODGES** responded that Still I Rise did not maintain a general ledger. OVW then directed **HODGES** to submit copies of Still I Rise's invoices and bank statements to support the 2014 grant expenditures. **HODGES** complied with that request, giving OVW much of the documentation it needed to conduct its initial review.

[3] All amounts are rounded down to the nearest dollar.

- Payments totaling $1,275 for interpretation services billed to "Still I Rise (Dr. **GLENDA F. HODGES**)" at WWC's address.

- Payments totaling $21,507 to MM3 Technologies LLC for IT network services at WWC.

- Payments totaling $2,751 in office supplies from Home Depot that were shipped to WWC.

18.     Records from BOA 1268 (the account into which OVW funds were deposited) show that OVW deposited $384,212 into BOA 1268 during 2014 and 2015, and that BOA 1268 received $308,927 in deposits from other sources. On December 11, 2015, BOA closed the account.

19.     The records associated with BOA 1268 show the misapplication and conversion of OVW funds. For instance, banks records show that OVW funds were used to make the following unlawful expenditures, as further discussed below. Notably, given the timing of when BOA 1268 received funding from the DOJ, the following transactions necessarily involved the conversion of OVW grant money.

| *Date of Transaction* | *Description of Transaction* |
|---|---|
| June 11, 2015 | A $4,000 check (Check 2404) to Individual 2, a physician at WWC. |
| July 15, 2015 | A $3,500 (Check 2429) to CSST with the notation "July Rent of WWC." |
| July 29, 2015 | A $1,003.53 electronic payment to OCWEN for the mortgage on **HODGES**'s personal property in North Carolina. |
| August 10, 2015 | A $2,724 check (Check 2445) to Individual 3, a nurse at WWC, with the notation "final check - payroll." |
| August 28, 2015 | A $305.66 electronic payment to Time Warner Cable for a North Carolina cable account.[4] |

---

[4] Time Warner Cable does not provide service in Maryland.

7

20.     Further, the BOA 1268 statements show that the largest single recipient of funds from BOA 1268 was Industrial Bank, which received $65,873 in checks from BOA 1268. Records from Industrial Bank show that the account used to receive the $65,873 was opened in 2013 in the name of CSST—the company that owned and operated WWC (but not Still I Rise). In March 2014, **HODGES** acquired a $270,000 commercial mortgage, Loan Number ending in 3363, for the benefit of CSST. The stated purpose of the loan on the application was the "acquisition of owner-occupied commercial real estate located at 9023 Woodyard Road, Clinton, Maryland." The loan application described CSST as doing business as the "Women's Wellness Center . . . a for-profit Maryland S-Corporation." $53,600 of the money transferred from BOA 1268 to Industrial Bank was deposited into CSST's checking account, and $12,273 was used to pay down the mortgage for WWC ("Loan 3363").

21.     Records also showed that **HODGES** used $20,720 from BOA 1268 to pay checks to two Chase Bank ("Chase") accounts—Chase 9112 and Chase 3714. Chase records show that **HODGES** refinanced her home mortgage with Chase through the Loan Number ending in 9112. **HODGES** also obtained a Chase credit card account ending in 3714 in the name of Still I Rise. However, numerous purchases **HODGES** made with the Chase 3714 card do not appear to be expenditures that were authorized under the OVW grant. For instance, Chase 3714 was used to make recurring purchases at Clinton Foreign Car Services, Spa World Centreville, and 1-800 Pet Meds.

22.     In 2014 and 2015, **HODGES** was authorized to pay herself a salary of $12,000 per year as Director of Still I Rise based on the budget that was approved by OVW. However, over that two-year time period, **HODGES** transferred a total of approximately $35,800 from Still I Rise's BOA 1268 account to her personal Bank of America accounts. In addition, **HODGES** wrote

8

checks totaling $18,500 from BOA 1268 to herself with the notation that the payments were an

"Owner's Draw." **HODGES** also wrote checks totaling $3,000 from BOA 1268 for "stipend" and

"expenses" and made approximately $7,850 worth of payments on her personal American Express

credit card account.

### *Additional Fraudulent Activity*

23.     Agents thereafter discovered that **HODGES** was involved in several frauds related

to Still I Rise and WWC, including the following:

- **HODGES** received a large wire payment from Victim 1—a mutual insurance company in Pennsylvania—as part of a business email compromise, then used that money for her personal benefit.

- **HODGES** deposited a stolen and altered business check that Victim 2—a large university in Texas—mailed to one of its contractors.

- **HODGES** used the identity of an elderly Still I Rise volunteer ("Victim 3") to apply for several lines of credit without Victim 3's consent.

- **HODGES** withheld federal employment taxes, but failed to remit those withheld taxes to the Internal Revenue Service ("IRS").

- **HODGES** directed her medical practitioners to inject saline solution in place of a drug used for fat dissolution.

### *Scheme to Defraud Victim 1*

24.     On October 9, 2015, BOA 1268 (Still I Rise's primary operating account) received

a wire transfer from the PNC Bank account of Victim 1 in the amount of $134,800. Before the

balance transfer, BOA 1268 had a balance of $18,890.

25.     On the day of and in the days after the wire was received, **HODGES** transferred

large amounts of money out of BOA 1268. On October 9, 2015, the same day the wire was

received, **HODGES** wrote a check for $30,000 to WWC's M&T Bank account with the notation

"WWC payroll." On October 13, 2015, **HODGES** wrote a check to herself in the amount of

9

$15,000 with the notation "owner's draw." That same day, **HODGES** wrote a check to CSST's bank account at Industrial Bank in the amount of $50,000 with the notation "Still I Rise/WWC operating expenses." On October 13, 2015, **HODGES** also made two direct deposits from BOA 1268—one to her personal savings account in the amount of $16,000 and another to an unidentified checking account in the amount of $9,000. The next day, on October 14, 2015, **HODGES** transferred $20,000 to two more checking accounts. Within six days of receiving the fraudulent wire from Victim 1 for $134,800, **HODGES** moved $140,000 out of BOA 1268.

26.    On January 17, 2019, agents interviewed Individual 5—Victim 1's treasurer and accountant—who told investigators that on October 15, 2015, he filed a complaint with the FBI regarding a fraud involving Victim 1 that resulted in a loss of approximately $240,000 to the company.

27.    In 2015, Individual 5 received four separate emails that directed Individual 5 to conduct money transfers from someone he then believed to be the Chief Executive Officer ("CEO") of Victim 1. Individual 5 followed the email instructions he received by sending three separate wire transfers to outside bank accounts.

28.    Individual 5 stated that he only realized after making the wire transfers that the emails purporting to be from Victim 1's CEO were fraudulent. Individual 5 explained that he had already transferred $270,000 from the Victim 1 account when he received a fourth email. Upon receipt of the fourth email, Individual 5 called the CEO to ask about the emails, at which point the CEO responded to Individual 5 that he did not send the emails.

*Scheme to Defraud Victim 2*

29.    On April 8, 2016, a $72,938 check written from Victim 2 was deposited into an EagleBank account ending in 1008 ("EagleBank 1008"), one of Still I Rise's business accounts

10

over which **HODGES** was the sole signer. The balance of EagleBank 1008 at the time of the deposit was $26.11. On April 13, 2016, EagleBank removed the deposit from the account after JP Morgan Chase returned the check to EagleBank as altered or fictitious.

30.     On April 12, 2018, agents spoke to Individual 4, who was Victim 2's senior vice president. According to Individual 4, the check from Victim 2 that was deposited into EagleBank 1008 was actually written to Victim 4, a web development contractor that Victim 2 hired in connection with a federal grant for cancer research. Individual 4 provided the agents with Victim 2's accounts payable record showing that the check—identified as Check Number 7737—was paid to Victim 4, and searched Victim 2's records to confirm that the entity never had a business relationship with Still I Rise or **HODGES**.

31.     On July 17, 2018, agents interviewed the owner of Victim 4, who stated that Victim 4 provides software and analytical support for Victim 2 and that Victim 2 pays Victim 4 through NIH grants. Victim 4 confirmed that approximately two years earlier, Victim 2 mailed him a check that was "slightly over $70,000," but that Victim 4 had not received the check. Victim 4 also confirmed that Victim 4 has no affiliation with **HODGES**, Still I Rise, or any other company in Maryland.

### *Scheme to Defraud Victim 3*

32.     During the investigation, agents interviewed Victim 3—a 71-year old accountant and retired school teacher who prepared **HODGES**'s personal tax returns for several years. Victim 3 also volunteered at Still I Rise on a regular basis and provided a number of short-term personal loans to Still I Rise to keep the entity running. Victim 3 provided agents with the following information pertaining to fraudulent lines of credit that **HODGES** opened using Victim 3's personal identifying information.

33.     In 2016, Victim 3 was hospitalized after having surgery that led to a life-threatening infection. While Victim 3 was recovering, **HODGES** visited Victim 3 in the hospital and asked Victim 3 to sign a Power of Attorney form so that **HODGES** could secure a $25,000 line of credit using Victim 3's identity.

34.     **HODGES** communicated to Victim 3 that Still I Rise was waiting for payment on a $90,000 county grant that had already been approved and needed the $25,000 in the interim. **HODGES** promised to repay the $25,000 once the county paid the $90,000 grant award. **HODGES** also explained to Victim 3 that **HODGES** could not obtain the loan herself because she had poor credit. Regarding the Power of Attorney form, Victim 3 did not review the document, **HODGES** did not give Victim 3 a copy of the form, and there were no witnesses in the hospital room when the document was signed. Victim 3 understood the form to apply only to the single loan.

35.     In early September 2016, **HODGES** paid for a medical transportation service to transport Victim 3 to the Navy Federal Credit Union ("NFCU") branch in Laurel Lakes, Maryland.[5] According to Victim 3, she did not know the purpose of the visit to NFCU, she did not complete a loan application or sign any paperwork, and she did not speak with a bank representative. Victim 3 only remembers being in pain and in a wheelchair with an antibiotic PICC line running to her heart, and **HODGES** later saying that the $25,000 loan was approved.

36.     Victim 3 thereafter discovered that **HODGES** acquired the $25,000 line of credit at NFCU, maxed out the line of credit, and failed to make payments, which caused Victim 3 to default on the loan.

---

[5] Victim 3 did not remember the exact branch, though the records show that the line of credit was obtained in Laurel Lakes.

37.     Records from NFCU show that on August 26, 2016, **HODGES** opened a credit account ending in 7869 in the name of Still I Rise ("NFCU 7869") using Victim 3's identity. Records also show that on September 6, 2016, a $5,000 cash advance was obtained on the line of credit and transferred the next day to **HODGES**'s personal NFCU checking account, over which **HODGES** was the sole signer. After the cash advance was transferred, NFCU called the account contact number to report suspicious activity. As discussed below, **HODGES** had listed her personal cell phone number as the primary means of contacting the account holder, thus preventing Victim 3 from communicating with NFCU.

38.     Victim 3 reviewed the credit application with investigators and confirmed that her name, date of birth, and social security number were used to open the account, but identified the following false line items on the application.

- The address reported for Victim 3 was **HODGES**'s home address in Clinton, Maryland, and the address on Still I Rise's corporate registration.

- The phone number was Still I Rise's office number (ending in 4903).

- The account contact number was **HODGES**'s personal cell phone number (ending in 4962).

- The application states that Victim 3 paid $800 in monthly rent. Victim 3 was a homeowner, who paid $2,600 in monthly mortgage payments.

- The application stated that Victim 3 was self-employed on a full-time basis. Victim 3 was retired.

- The email address was that of Still I Rise's manager, Individual 1.

39.     Victim 3 also told investigators that around the same time she learned about the NFCU account, she discovered that **HODGES** acquired a bank account from M&T Bank using Victim 3's identity and accumulated approximately $20,000 in debt. Victim 3 never gave **HODGES** permission to open this account, and otherwise did not know what **HODGES** did with

13

the account. Records show that on March 10, 2016, **HODGES** fraudulently opened a credit account ending in 6442 in the name of Still I Rise at M&T Bank ("M&T Bank 6442") using Victim 3's identity.

40.     Victim 3's voluntary work for **HODGES** consisted of preparing 2015 Forms W-2 for Still I Rise's employees and Still I Rise's Form 990. With respect to **HODGES**'s solvency, Victim 3 remembered that Still I Rise owed a number of employees' wages that the company never paid.

### *WWC's Medical Practitioners*

41.     Agents conducted the following interviews of medical practitioners who worked at WWC. Through those witnesses, your affiant learned that WWC was providing a service largely unrelated to violence against women, had severe cash flow problems, was not satisfying its payroll obligations, was withholding employment taxes that **HODGES** did not remit to the IRS, was conducting inaccurate blood tests, and was replacing fat-dissolution injectable compounds with saline solution.

### *Individual 2*

42.     During the investigation, agents interviewed Individual 2, who was WWC's medical director from January 2015 to January 2017. Individual 2 completed his residency at a university hospital in 2010, when he met **HODGES** while **HODGES** was working as the university's Director of Operations. During his initial meeting with her, **HODGES** described WWC as a primary care clinic with a focus on medical care for women. **HODGES** also told Individual 2 during this meeting that she operated Still I Rise, which **HODGES** described as a counseling and support program for battered women.

14

43.     Individual 2 worked at WWC four hours per week at a rate of $2,000 per month. According to Individual 2, patient volume at WWC was low. Individual 2 remembered that **HODGES** often introduced herself to patients at WWC as "Dr. **HODGES**," wearing a white lab coat and identifying herself as the owner of the practice. Individual 2 thought this was unusual because he had never seen a non-medical practitioner wear a white lab coat inside a medical practice.

44.     Individual 2 told agents that practitioners at WWC informed him that **HODGES** instructed them to inject saline solution instead of Lipo-C, a fat-dissolution injectable compound. For his part, Individual 2 told the practitioners not to do so.

45.     As was the case with other employees, some of Individual 2's payroll checks were returned for insufficient funds. Individual 2—who was on WWC's Board of Directors—also told agents that **HODGES** misled the other board members about WWC's financial success, patient volume, and employee retention.

46.     Individual 2 added that the entire time he was at WWC, he saw at most two patients who were referred from Still I Rise and that he also treated men at WWC.

*Individual 6*

47.     Agents interviewed Individual 6 on February 15, 2019. Individual 6 is a certified registered nurse practitioner in Maryland and Washington, DC and worked as a full-time nurse from 1998 to 2016. Individual 6 provided the following information regarding **HODGES** and WWC.

48.     Individual 6 worked at WWC between July and November 2016. During that time, Individual 6 was WWC's sole nurse practitioner, and Individual 2 was the managing physician. Individual 6 quit WWC because **HODGES** was not paying her or remitting her payroll taxes to

15

the State of Maryland or the IRS. **HODGES** still owes Individual 6 approximately $13,000 in wages. According to Individual 6, many of the payroll checks Individual 6 attempted to negotiate were returned for insufficient funds. Individual 6 also remembers **HODGES** routinely asking her employees for loans. During the winter, WWC's cash flow problems were so severe that Individual 6 had to purchase flu shots with her own money to administer to patients.

49.     Individual 6 identified several other troubling issues at WWC. First, **HODGES** often wore a white lab coat and identified herself as "Dr. **HODGES**" in the clinic, despite the fact that **HODGES** is not a medical doctor. Second, Individual 6 remembers several occasions when a medical technician drew blood into the wrong or expired tubes, causing inaccurate results. When Individual 6 informed **HODGES** of the problem, **HODGES** instructed Individual 6 to falsely tell the patient that the inaccurate results were the fault of WWC's off-site laboratory. Third, **HODGES** repeatedly asked Individual 6 to inject patients with saline solutions instead of Lipo-C (the fat-dissolution solution), something Individual 6 refused to do. When Individual 6 brought this problem to Individual 2's attention, **HODGES** admonished Individual 6, telling her that "she is the owner and that Individual 6 could not go above her."

*Individual 3*

50.     On April 2, 2019, agents interviewed Individual 3, a board-certified and registered nurse who earned her master's degree from well-known university in Philadelphia. Individual 3 applied to WWC in November 2013, and thereafter interviewed with **HODGES** and Individual 7, who Individual 3 understood to be WWC's manager. Individual 3 provided the following information regarding **HODGES** and WWC.

51.     In January 2015—around the time of WWC's opening—Individual 3 began working for WWC. Individual 3 recalled that WWC was focused on wellness and weight loss.

16

Patient volume at WWC was at first extremely low—the clinic averaged only one to two patients per day, though toward the middle of the year, the volume increased to eight or nine patients per day. On July 27, 2015, Individual 3 quit when **HODGES** falsely accused her of poorly treating a patient's family members.[6]

52.     On the issue of taxes, Individual 3 recalled asking Individual 1 (**HODGES**'s assistant and office manager) for a Form W-2 so she could purchase a new home, and getting a Form W-2 that reflected only half of her wages from WWC. Individual 3 confronted Individual 1, who told Individual 3 that WWC was having a software issue. According to Individual 3, her paychecks were usually handwritten and did not reflect tax or other withholdings.

53.     On one occasion, **HODGES** ordered everyone to Individual 7's office, where **HODGES** informed the employees that they were not allowed to deposit their paychecks because the center's "funds were on hold." After quitting, Individual 3 reached out to Individual 1 to get her final paycheck, but Individual 1 told Individual 3 that a bat bit **HODGES**, thus somehow preventing **HODGES** from signing Individual 3's paycheck.

### *Still I Rise and WWC Accounting*

54.     Agents interviewed Individual 9, an accountant, several times during the investigation. Individual 9 is a CPA who now works as the Chief Financial Officer for a particular health plan. Individual 9 also owns a company through which he provided accounting services to **HODGES**. Individual 9 provided the following information regarding **HODGES** and WWC.

55.     Around 2010, **HODGES** approached Individual 9 to work for Still I Rise, which **HODGES** described as a shelter that provided temporary housing to women in need. Over the

---

[6] Individual 8, a WWC employee, relayed to Individual 3 that **HODGES** admitted to fabricating the accusation.

next three years, Individual 9 visited Still I Rise quarterly to generate reports that **HODGES** could send to the DOJ to satisfy Still I Rise's reporting requirements.

56.     Individual 9 recalled that in 2015, **HODGES** created CSST, a for-profit company, and acquired an old bank property to convert into WWC. Individual 9 described WWC as a department of Still I Rise that operated under Still I Rise's non-profit status, though he also stated that WWC was a fee-for-service physician's office. Individual 9 also told agents that he did not give **HODGES** advice on how to structure her companies and that the Board of Directors was only "sort of" managing the two entities.

57.     Individual 9 initially told agents that Still I Rise's expenses appeared to be allowable under the grant and that he received positive feedback from DOJ after submitting reports related to the grant money.[7] According to Individual 9, **HODGES** was not sophisticated in the area of accounting, but that **HODGES** was sensitive to DOJ's grant requirements. However, Individual 9 told agents that he told **HODGES** that she could not use grant money for WWC, and could not have Still I Rise employees perform work for WWC.

58.     Individual 9 also said that **HODGES** had "sole control over the bank accounts and the drawdowns," which itself was an internal control problem.

59.     With respect to tax issues, Individual 9 recounted Individual 7 saying that withholdings were not being remitted to the IRS.

60.     Finally, Individual 9 often reviewed the Still I Rise bank accounts that were used to receive DOJ grant money. According to Individual 9, he noticed personal expenditures—such

---

[7] Individual 9 personally coded expenses as allowable or disallowable under the grant. Individual 9 did not recall using a specific budget, including the budget submitted as part of the grant application, when coding the expenses, nor did Individual 9 explain his process for coding expenses as allowable or disallowable.

20-1497-TJS

as nail salon expenses and restaurant purchases. When confronted, **HODGES** replied that she was taking victims to nail salons and restaurants.

61.     In addition, Individual 9 provided the following information to the government.

- When Individual 9 began working for Still I Rise, **HODGES** told Individual 9 that the DOJ grant money was to be used only for the violence against women program.

- Individual 9 and **HODGES** attended a telephonic training in which OVW told them that the grant money could only be used for the stated purpose of the grant, and that **HODGES** never expressed any confusion about this requirement.

- Each quarter, Still I Rise had to submit a quarterly report to OVW that consisted of a written report and an Excel file describing the expenditures. **HODGES** wrote the written reports, which Individual 9 never saw. Individual 9 produced drafts of the Excel files, but then sent those files to **HODGES** in native format. Individual 9 never saw the final versions of the Excel files that **HODGES** submitted to OVW.

- Hodges never gave Individual 9 her grant proposals or budgets (or any of the grant paperwork), and Still I Rise kept what Individual 9 referred to as "no accounting records." This made it difficult for Individual 9 to produce accurate reports for OVW.

- Individual 9 saw expenses that were clearly disallowable, and told **HODGES** she needed to replace that money in Still I Rise's bank account. There were other expenditures that—with the benefit of retrospect—Individual 9 would have coded as disallowable, including payments for a mortgage on a property that did not belong to Still I Rise.

- There was no hierarchy at Still I Rise, only "**HODGES** and then support personnel underneath her."

- CSST was the umbrella company for WWC, which was a for-profit clinic that was distinct from Still I Rise. Individual 9 had "extensive" discussions with **HODGES** about keeping WWC and Still I Rise separate. Individual 9 also told **HODGES** not to use DOJ money for the benefit of WWC.

*Hodges Director of Operations*

62.     On February 12, 2019, agents interviewed Individual 7—**HODGES**'s Director of Operations. Currently, Individual 7 runs his own financial services business, which has been in operation since May 2019. In July 2014, **HODGES** recruited Individual 7 to work for Still I Rise

and WWC. In that capacity, Individual 7 helped set up the electronic medical record system, acquired office supplies, and managed the staff. WWC officially opened in January 2015. Individual 7 provided the following information regarding **HODGES** and WWC.

63.    Individual 7 recounted that he prepared financial reports for Still I Rise, though Individual 9 helped with this process. Every month, Individual 7 made copies of Still I Rise's bank statements and gave them to Individual 9, who prepared formal reports that went to the DOJ. Individual 7 understood that the DOJ money was supposed to go to counseling victims of domestic violence, though Individual 7 acknowledged that **HODGES** comingled Still I Rise and WWC's revenues.

64.    According to Individual 7, patient volume at WWC was low. WWC derived much of its revenue through a nursing home in Clinton, Maryland. Individual 2 (WWC's managing physician) had a contract with the nursing home, but Individual 2 billed the nursing home through WWC. If Individual 2 was not available to visit patients at the nursing home, WWC sent nurse practitioners instead. Like other employees who OIG interviewed, Individual 7's paychecks were often returned for insufficient funds. Individual 7 also voiced concerns about **HODGES**'s failure to remit payroll taxes.

65.    Individual 7 told agents that **HODGES** was misleading her Board of Directors and OVW. Before one of the board meetings, **HODGES** asked Individual 7 to prepare income statements and revenue projections for WWC. Individual 7 conservatively projected revenue growth of 15 percent, but **HODGES** asked Individual 7 to change that number to 150 percent.

66.    Further, in 2015, **HODGES** began directing her employees to sign in at Still I Rise as clients to substantiate the grant funding.

20

*WWC's Revenue Cycle Manager*

67.     Individual 8 was hired as the Revenue Cycle Manager at WWC in late 2014 and was responsible for managing the medical credentialing and billing. When interviewed, Individual 8 stated she visited the Still I Rise offices several times per day to get office supplies from Still I Rise. Individual 8 stated that the front desk clerk at Still I Rise often asked Individual 8 to sign in on the client sheet—as if Individual 8 were a victim receiving counseling services—because those sheets would be used to justify Still I Rise's funding. Individual 8 also signed in using different names, and stated that anyone who went to Still I Rise's office to interview for a job at Still I Rise or WWC was also asked to sign in as a client. The front desk clerk told Individual 8 that the actual client numbers at Still I Rise did not match the numbers provided to the government.

68.     Thus, the evidence shows that **HODGES** unlawfully diverted OVW grant funding to the WWC rather than using the money solely to fund Still I Rise's the approved violence against women program.

<u>Conclusion</u>

69.     Based on the foregoing, there is probable cause for this Court to issue the requested complaint and arrest warrant.

_____
Special Agent Amy McAleese
Department of Justice
Office of Inspector General

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this ___9th___ day of June, 2020.

_____
Honorable Timothy J. Sullivan
United States Magistrate Judge

21